# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**LAWRENCE WILLIAMS**                                     **CIVIL ACTION**

**VERSUS**                                                               **NO.  13-0145**

**WARDEN NATHAN CAIN**                             **SECTION "F"(4)**

## REPORT AND RECOMMENDATION

 This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I. Factual Background

 The petitioner, Lawrence Williams ("Williams"), is a convicted inmate currently incarcerated in the Avoyelles Correctional Center in Cottonport, Louisiana.[2]  On August 27, 2008, Williams was charged by Bill of Information in Orleans Parish with four (4) counts of armed robbery and one (1) count of being a convicted felon in possession of a weapon.[3]  He entered a plea of not guilty to the charges on September 10, 2008.[4]

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2] Rec. Doc. 1.

[3] St. Rec. Vol. 1 of 4, Bill of Information, 8/27/08.

[4] St. Rec. Vol. 1 of 4, Minute Entry, 9/10/08.

The record reflects that, around 10:30 or 11:00 p.m. on May 16, 2008, Kimberly Tompkins, Brittany Nagim, and Heather Keller were headed to a nightclub called the "Frat House" on Willow Street to celebrate Keller's birthday.[5]  Nagim drove the three women to the 1400 block of Dublin Street near the streetcar barn, to park near Willow Street and the bar.  They got out of the car to take photographs of each other when they were approached by a man, later identified as Williams.  He had a large handgun that was bright silver with a black handle and demanded that the women give him their money.  Tompkins gave him $10.00, and Nagim and Keller each gave him $20.00.  Although the women had purses, cameras and cell phones with them, Williams took only the cash.

After, Williams walked away and disappeared behind a building.  The women got back in the car and drove to the front of the Frat House to call 911.

Late on the night of May 18, 2008, Timothy Moore,[6] headed to the Frat House to meet friends.  Moore parked his car on the cross-street near the bar.  As he was getting out of the car, he saw a man crossing the street behind him.  Before he could close the car door, the man, later identified as Williams, pointed a large silver handgun at him and asked for his valuables.  Moore handed Williams his wallet, which contained about $350.00.  Williams then ordered Moore to stop looking him, get back in the car and to leave.  Moore got back in his car and called 911.

About two months later, based on the descriptions from the victims, New Orleans Police Detective Jerry Baldwin prepared a photographic line-up with six photographs.  He included a photograph of Williams, because Williams matched the description given by the victims.  Williams

---

[5]The facts were taken from the published opinion of the Louisiana Fourth Circuit Court of Appeal on direct appeal. *State v. Williams*, 66 So.3d 1207, 1209-12 (La. App. 4th Cir. 2011); St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 2010-KA-1197, pp. 2-8, 5/25/11.

[6]His name is spelled "Mohr" on the Bill of Information and "Moore" in the transcript and state court rulings.

also had recently been arrested in connection four unrelated armed robberies while carrying what Baldwin believe to be a silver and black handgun.  The detective met the three female victims at Tompkins's residence, where they separately identified Williams from the line-up.  Detective Baldwin later met with Moore at police headquarters and presented him with the line-up.  Moore also immediately identified Williams as the robber.

At a pretrial hearing held on February 10, 2009, the Trial Court granted Williams's motion to sever the felon in possession count from the four armed robbery charges.[7]  Williams thereafter was tried before a jury on the four armed robbery charges on April 29, 2009, and was found guilty as charged on each count.[8]  The subsequent jury trial on count five, felon in possession, was held June 15, 2009, and ended in a mistrial when the jury was unable to reach a verdict.[9]  The State eventually entered a nolle prosequi as to that count.[10]

At a hearing held on September 25, 2009, the state trial court sentenced Williams to twenty-five (25) years in prison at hard labor on each of the four armed robbery counts, to be served concurrently and without benefit of parole, probation, or suspension of sentence.[11]  The Court denied Williams's motion to reconsider the sentence.[12]

---

[7]St. Rec. Vol. 1 of 4, Minute Entry, 2/10/09; Trial Court Order, 2/10/09; Motion to Sever, 2/10/09.

[8]St. Rec. Vol. 2 of 4, Trial Minutes, 4/29/09; St. Rec. Vol. 1 of 4, Jury Verdict (count one), 4/29/09; Jury Verdict (count two), 4/29/09; Jury Verdict (count three), 4/29/09; Jury Verdict (count four), 4/29/09; St. Rec. Vol. 3 of 4, Trial Transcript, 4/29/09.

[9]St. Rec. Vol. 1 of 4, Trial Minutes, 6/15/09; St. Rec. Vol. 2 of 4, Jury Verdict (count five) 6/15/09.

[10]St. Rec. Vol. 1 of 4, Minute Entry, 9/25/09; Minute Entry(2), 9/25/09.

[11]St. Rec. Vol. 1 of 4, Sentencing Minutes, 9/25/09; St. Rec. Vol. 3 of 4, Sentencing Transcript, 9/25/09.  The State also filed a multiple bill that day and the record does not reflect that a hearing was ever held on that bill.  St. Rec. Vol. 1 of 4, Minute Entry, 9/25/09; Multiple Bill, 9/25/09.

[12]St. Rec. Vol. 1 of 4, Minute Entry, 9/25/09; Trial Court Order, 9/25/09; Motion to Reconsider Sentence, 9/25/09.

On direct appeal, Williams's appointed counsel argued that the Trial Court erred in denying the motion to suppress the unduly suggestive identifications.[13]  On his own behalf, Williams filed a supplemental brief arguing the same issue.[14]  The Louisiana Fourth Circuit affirmed Williams's conviction on May 25, 2011, finding no merit in the arguments raised.[15]

The Louisiana Supreme Court denied Williams's related writ application without stated reasons on February 3, 2012.[16]  His conviction and sentence became final ninety (90) days later, on May 3, 2012, because he did not file a writ application with the United States Supreme Court.  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

In the meantime, on February 7, 2012, Williams submitted an application for post-conviction relief to the Trial Court in which he asserted two (2) grounds for relief:[17]  (1) he was denied effective assistance of counsel where counsel failed to adequately investigate and prepare for trial; and (2) he was denied a fair trial when the State knowingly used the perjured testimony of Detective Baldwin and failed to correct it.  The Trial Court denied relief on April 20, 2012, finding the claims to be meritless.[18]

---

[13]St. Rec. Vol. 2 of 4, Appeal Brief, 2010-KA-1197, 10/12/10.

[14]St. Rec. Vol. 2 of 4, *Pro Se* Supplemental Brief, 2010-KA-1197, 12/18/10.

[15]*Williams*, 66 So.3d at 1207; St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 2010-KA-1197, 5/25/11.

[16]*State v. Williams*, 79 So.3d 1023 (La. 2012); St. Rec. Vol. 4 of 4, La. S. Ct. Order, 2011-KO-1281, 2/3/12; La. S. Ct. Writ Application, 11-KO-1281, 6/20/11 (postal metered 6/15/11, dated 6/14/11); St. Rec. Vol. 2 of 4, La. S. Ct. Letter, 2011-KO-1281, 6/20/11 (showing postal meter 6/15/11).

[17]St. Rec. Vol. 1 of 4, Application for Post-Conviction Relief, dated 2/7/11 (no file stamp).

[18]St. Rec. Vol. 1 of 4, Trial Court Judgment, 4/20/12.

The Louisiana Fourth Circuit and the Louisiana Supreme Court denied without stated reasons Williams's related writ applications on June 4, 2012, and November 2, 2012, respectively.[19]

## II.   Federal Petition

On January 29, 2013, the clerk of this Court filed Williams's federal petition for habeas corpus relief in which he raised the following grounds for relief:[20] (1) the Trial Court erred in denying the motion to suppress the unduly suggestive identifications; (2) he was denied effective assistance of counsel where counsel failed to adequately investigate and prepare for trial; and (3) he was denied a fair trial when the State knowingly used perjured testimony of Detective Baldwin and failed to correct it.

The State filed a memorandum in opposition to Williams's petition conceding that the petition was timely filed and that the claims were exhausted in the state courts.[21]   The State argues, however, that the claims are without merit and that the petition should be dismissed with prejudice.

## III.   General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[22] applies to this petition, which is deemed filed in this court under the federal

---

[19] *State ex rel. Williams v. State*, 99 So.3d 665 (La. 2012); St. Rec. Vol. 4 of 4, La. S. Ct. Order, 2012-KH-1437, 11/2/12; La. S. Ct. Writ Application, 12-KH-1437, 6/25/12 (postmarked 6/19/12, dated 6/19/12); St. Rec. Vol. 1 of 5, La. S. Ct. Letter, 2012-KH-1437, 6/25/12; St. Rec. Vol. 4 of 4, 4th Cir. Order, 2012-K-0779, 6/4/12.

[20] Rec. Doc. No. 1.

[21] Rec. Doc. No. 16.

[22] The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

mailbox rule on January 18, 2013.[23]  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes and the record confirms that Williams's petition is timely filed and the claims are exhausted.  The record does not reflect that any of the claims are in procedural default.  Therefore, the Court will address the substance of his claims.

## IV.   Standards of Review of the Merits

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court

---

[23]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Williams's federal habeas petition on January 29, 2013, when pauper status was granted.  Williams dated his signature on the petition on January 18, 2013.  This is the earliest date appearing in the record on which Williams could have presented the pleadings to prison officials for mailing to a court.

findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *See Williams*, 529 U.S. at 410. The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *Id.* "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

7

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

## V.     Suggestive Identification Procedure (Claim No. 1)

Williams alleges that the state trial court erred in denying the motion to suppress the photographic identifications made by victims because the procedure used was suggestive in several ways. He claims that the photographic line-up was generated by Detective Baldwin based solely on the description of his "salt and pepper" hair without taking age into account. He also complains that Detective Baldwin instructed two of the victims to choose the photograph of the person most closely resembling the perpetrator rather than to choose the picture of the perpetrator. Williams further contends that Baldwin told the victims that the line-up contained a picture of the possible suspect.

The State argues that Williams claims are without merit, and he has failed to established that the denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

Williams and his counsel raised these arguments on direct appeal in challenging the denial of the motion to suppress the identifications. In the last reasoned opinion by the Louisiana Fourth Circuit, the court relied upon the factors outlined in *Manson v. Brathwaite*, 432 U.S. 98 (1977), and

related state law, to find that the identification procedures were not suggestive and there was no likelihood of misidentification.

Evaluation of a claim of a suggestive identification process is a mixed question of law and fact. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *see Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006); *Woodard v. Thaler*, 414 F. App'x 675, 678 (5th Cir. 2011).   To be entitled to relief, petitioner must establish that the state courts' denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

In *Simmons v. United States*, 390 U.S. 377, 383-84 (1968), the United States Supreme Court set forth a two-prong test for the exclusion of identifications based on impermissibly suggestive photo arrays which are found to deny due process.  The first prong requires a determination of whether the identification procedure was impermissibly suggestive.  If it is not, the inquiry ends.  If it is, however, a separate inquiry must be made as to whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

Later, in *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977), cited by the Louisiana Fourth Circuit, the Supreme Court reaffirmed several factors enumerated in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), that should be considered when reviewing the reliability of a witness's identification. These include: (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of the description; (4) the witness's level of certainty; (5) the elapsed time between the crime and the identification; and (6) the corrupting influence of the suggestive identification itself.  *Passman v. Blackburn*, 652 F.2d 559, 570-71 (5th Cir. 1981); *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990); *Woodard v. Thaler*, 414 F. App'x 675, 678 (5th Cir. 2011).

In this case, the state trial court held a hearing on Williams's motion to suppress the identifications and that testimony was reestablished at trial before the jury.  The Louisiana Fourth Circuit examined both transcripts under the *Manson* factors and related state law to support the conclusion that the *Manson* factors were met.  The record supports the Court's conclusion and application of *Manson* for the following reasons.

Williams first complains that the photographic line-up focused only on his salt-and-pepper colored hair as the distinguishing feature in selecting photographs for the line-up.  As noted by the Louisiana appellate court, the record does not contain a copy of the photographic line-up nor has one been provided by Williams for any court to review post-trial.  Nevertheless, Williams does not refute that the hair color description was in fact a distinguishing feature provided by the victims to the detective.  As attested to by Detective Baldwin, this was not the <u>only</u> basis for the photograph choices.  The Detective testified that he used the hair color along with Williams's other physical characteristics, such as age, complexion, and height, in selecting comparable photographs.[24]  He also indicated that the location of the new robberies, less than one-mile away, and the gun description were all considered in selecting Williams as a potential suspect.

The record therefore does not support Williams factual assertion that only his hair color was considered.  He also does not provide a basis to question the factual findings made by the Louisiana Fourth Circuit related thereto.  Williams has failed to establish the suggestiveness of the photograph array.

In addition, there is no indication that Detective Baldwin's instructions to the victims during the photograph review created confusion or rendered to the process unduly suggestive.  Each of the

---

[24]St. Rec. Vol. 3 of 4, Trial Transcript, pp. 88, 90, 98 (Detective Baldwin), 4/29/09.

victims indicated that, without assistance or suggestion from Baldwin, they each readily identified Williams as the robber.[25] As will be discussed in more detail, all four victims testified that they had a good look at Williams in the well lit area where the robberies occurred. The record contains nothing to establish that the process was suggestive.

Furthermore, in evaluating the *Manson* factors specifically, Williams has not demonstrated a likelihood of misidentification. First, all four victims testified that they had ample time to see the perpetrator during the robberies.[26] Tompkins, Keller, and Nagim each testified that the area where the robbery occurred was well-lit.[27] Each of the four victims indicated that they got a good look at Williams.[28] So much so, that Moore testified he stared at the man so long, Williams finally ordered him to "stop f- - - - -g looking at me."[29] Keller also went so far as to say that "99 percent of the time" she was looking at Williams's face.[30]

Second, as to the degree of attention, all of the victims were close enough to Williams to hand him their money at his demand. None of the victims had been drinking prior to being robbed.[31] Each of the victims provided great details about the scene, his description and everything that was said and done during their respective robberies. Nagim even testified that, in an effort to prevent him from

---

[25]*Id.*, pp. 25, 36 (Tompkins), pp. 45, 52 (Keller), pp. 59, 68 (Nagim), pp. 74, 75 (Moore).

[26]*Id.*, p. 24 (Tompkins)

[27]*Id.*, p. 24 (Tompkins), p. 40 (Keller).

[28]*Id.*, p. 40, 51 (Keller).

[29]*Id.*, p. 80 (Moore), *see also*, p. 72.

[30]*Id.*, p. 40 (Keller).

[31]*Id.*, p. 24 (Tompkins), *Id.*, p. 39 (Keller).

stealing her car, she slowly moved completely around him to get closer to the car which also allowed her get the "full dimension of his face."[32]

Third, as for the accuracy of the descriptions, each of the victims' descriptions were consistent and unwavering.  Although not asked at trial to describe the perpetrator at the time of the robbery, Tompkins, Keller, and Nagim each described an identical incident and scene, down to the color of the nearby trash dumpster.  Moore also testified that the perpetrator was "about 35 or 40" and "was wearing [a] red shirt, blue jeans, and . . . a hat."[33]  Additionally, each of the witnesses testified to the same description of the gun previously given to police, and each was certain that the gun presented to them at trial was <u>not</u> the gun he used that night.[34]  The record discloses that the witnesses paid great attention to detail and were cohesive and consistent with their descriptions of Williams and the crime.

Fourth, as to the certainty of the description, all four witnesses provided the detectives with the same description of Williams with specificity.[35]  Each victim was immediately able to identify Williams from the photographic line-up presented to them.  They each identified him at trial without hesitancy when asked to do so.[36]

Fifth, there was no extensive length of time between the crime and the identification.  Tompkins, Keller, and Nagim testified that they were robbed on May 16, 2008, and made the

---

[32]*Id.*, p. 65 (Nagim).

[33]*Id.*, pp. 81-82 (Moore).

[34]*Id.*, p. 27 (Tompkins), p. 41-42 (Keller), p. 56 (Nagim).

[35]*Id.*, pp. 88, 90, 98 (Detective Baldwin).

[36]*Id.*, p. 26 (Tompkins), p. 59 (Nagim).

photographic identification on July 23, 2008.  Moore testified that he was robbed on May 18, 2008, and viewed the photographic line-up on July 24, 2008.  The confident and quick identifications were made less than nine weeks after the incident.  This is not so long as to demonstrate a likelihood of unreliability.  *Cronnon v. Alabama*, 587 F.2d 246 (5th Cir. 1979) (two month delay after murder for witness to make first identification from photographic line-up was not unduly suggestive where no prior or incorrect identification was made demonstrating witnesses reliability) (citing *Neil*, 409 U.S. at 201); *see also*, *United States v. Washam*, 468 F. App'x 568, 571 (6th Cir. 2012) (agreeing with trial court that two month delay between robberies and photograph identification was "insignificant."); *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) ("Three months is not a great length of time between an observation and an identification."); *United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) ("A three to four-month delay between the crime and the identification does not render the identification inherently unreliable.").

Considering the foregoing, Williams has not established that the identification process was suggestive or under the totality of the circumstances that the identifications were unreliable.  He therefore has not shown that the state courts' denial of relief was contrary to, or an unreasonable application of, *Manson* and its progeny.  He is not entitled to relief on this issue.

## VI.   Effective Assistance of Counsel (Claim No. 2)

Williams contends that his trial counsel provided ineffective assistance when he failed to adequately investigate and prepare for trial.  Specifically, he claims that counsel failed to adequately challenge the weak identification made by Moore and failed to subpoena two critical witnesses he identifies as the two officers who wrote the initial police report in the Moore robbery to show the inconsistencies in his identification.  He also claims that counsel erred in failing to investigate his

medical records to show that he has a metal-rod in his right leg that causes him to walk with a limp, a distinguishing feature not mentioned by the victims.  The State argues that Williams can not meet the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and he is not entitled to relief.

Williams raised this issue on post-conviction review and the Trial Court denied relief relying on the standards set forth in *Strickland*.  This was the last reasoned decision on the issue.  *Ylst*, 501 U.S. at 802.

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).  The question for this Court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.

The Supreme Court's holding in *Strickland*, 466 U.S. at 668, applied by the Louisiana court, is the appropriate standard for judging the performance of counsel.  In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *See Strickland*, 466 U.S. at 697.  The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence.  *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992).  In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*,

14

262 F.3d 438, 450 (5th Cir. 2001).  "The defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances.  *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009).  The reviewing court must "judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 787 (2011) (citing *Strickland*, 466 U.S. at 689).  "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell*, 535 U.S. at 697 (citing *Strickland*, 466 U.S. at 689).  As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  *Strickland*, 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010).  Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice."  *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695).  In this context, "a reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 131 S. Ct. at 792. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 131 S. Ct. at 788. The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.,* at 788 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) therefore is "doubly deferential." *Cullen*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The federal courts must take a "highly deferential" look at counsel's performance under the *Strickland* standard

16

through the "deferential lens of § 2254(d)." *Id*. (citing *Strickland*, 466 U.S. at 689, and quoting *Knowles*, 556 U.S. at 121 n.2).

Williams alleges that his counsel was ineffective in failing to use the Moore police report and/or call the officers who investigated the Moore robbery to adequately challenge the weak identifications made by Moore. He argues that the information given by Moore to the initial investigating officers was contrary to his trial testimony about the identity of the perpetrator. He also claims that the two investigating officers, C. Branch and Detective R. Hurst, wrote in their report that Moore did not get a good look at the perpetrator. He concludes that counsel was ineffective for failing to call the two officers to create doubt about Baldwin's testimony and Moore's identification.

Written in the initial police report narrative is the following comment: "It should be noted that Mr. Mohr stated that he did not get a good look of the suspect's face because the gun was pointed at him the entire time." The record, however, reflects that Williams' counsel did question Moore as to wether he told police that he might not be able to recognize the man again.[37] Moore replied, "No."[38] Counsel later attempted to garner the same information from Detective Baldwin by asking if it had come to his attention from the police report that Moore felt as though he did not get a good look at the person. Baldwin also replied "No."[39] The police report and the record also reflect that Moore in fact gave a detailed description of the perpetrator to police as early as the 911 call he made from his car.[40]

---

[37]St. Rec. Vol. 3 of 4, Trial Transcript, p. 81, 4/29/09.

[38]*Id*., p. 81.

[39]*Id*., pp. 103-04.

[40]*Id*., p. 81.

Although counsel could have asked Moore about the officers' comment in the police report, his decision not to do so fell within the realm of reasonable trial strategy. The same is true of the decision not to call the officers who prepared the report. Even if the statement in the report was accurate, Moore had already denied making the comment to police and offered a full description of Williams just as he had to police. The jury was left to assess his credibility.

Furthermore, the overwhelming evidence already presented at trial showed the certainty with which all of the victims, including Moore, could and did identify Williams. The record therefore supports the state courts' conclusion that Williams did not establish that counsel's trial decision was prejudicial to the outcome of the case.

Williams also argues that counsel erred in failing to investigate his medical records which could have established that he walked with a limp, a characteristic not mentioned by the victims of these robberies as it had been in the later robberies that led to his arrest. "'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" (citation omitted) *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998). A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation would have shown. *Diaz v. Quarterman*, 239 F. App'x 886, 890 (5th Cir.2007) (citing *Strickland*, 466 U.S. at 696, in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different."). Rather, to prevail on such a claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed. *See Moawad*, 143 F.3d at 948; *see also Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir. 2005); *Davis*

*v. Cain*, No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008) (order adopting referenced Report and Recommendation).

As noted, Williams suggests that further investigation by counsel would have produced evidence of his limp not included in the descriptions of the perpetrator. Williams has not presented any evidence to this Court or to the state courts that he in fact has a noticeable limp as he suggests.

Nevertheless, a review of the trial transcript reflects that none of the victims saw Williams walking at the scene for any extended time. For example, on questioning by defense counsel, Tompkins testified that Williams "popped up" out of nowhere after they took a picture in the street by their car.[41] As he left with their money, he backed away as they turned to get into the car.[42] Keller and Nagim similarly testified that Williams came out of nowhere just after they took the picture.[43] "He popped up right there, like as if he was next to my car."[44] He then just backed away and disappeared behind the building a few feet away as they turned to get in the car after the robbery. None of the women actually watched Williams's gate as they admittedly were afraid, crying and anxious to get in the car.

Moore also testified that Williams approached him as he exited his car and before he could close the door.[45] Moore first saw Williams only a few feet away in the middle of the street as he was pulling out the gun. After taking his wallet, Williams told Moore to get back in his car. Moore testified that Williams did not walk away until after he got into his car, and at that point Moore

---

[41]St. Rec. Vol. 3 of 4, Trial Transcript, p. 30, 4/29/09.

[42]*Id.*, p. 33.

[43]*Id.*, p. 48.

[44]*Id.*, p. 63 (Nagim).

[45]*Id.*, p. 71.

remained crouched in his car as he called 911 afraid to look out for fear he would be shot.[46]  Thus, he did not have the opportunity to watch Williams gate.

Suffice it to say, the victims were focused on the gun and the perpetrator's face.  They did not stand around the scene to watch Williams walk or limp away with their money.  More importantly, counsel was faced with four victims who had already given full descriptions and definitive identifications of Williams.  Assuming Williams had a limp, it was reasonable for counsel to choose not to call more attention to another specific detail of his physical characteristics.  In other words, counsel's decision not to point to a limp was within the reasonable scope of trial strategy.  Furthermore, because of the definitive identifications already made, the failure of counsel to explore whether a limp was manifested in the few steps actually witnessed by the victims was not unreasonable performance or prejudicial to the verdict.

Finally, Williams alleges that counsel was deficient in failing to object to the allegedly false testimony of Detective Baldwin regarding the gun seized from him at his arrest for the other, unrelated crimes.  At trial, Baldwin testified that Williams became a person of interest because he was arrested for armed robberies that occurred about one mile from the May 2008 robberies and matched the physical description of the perpetrator in the four armed robberies near the Frat House two months earlier.  The Detective testified that Williams was also arrested with a handgun that he believed to be similar to the silver and black handgun used in the other four robberies.  Baldwin also testified that he viewed the handgun on the day of Williams's arrest and felt that it was a match.

Williams argues that, had his counsel been better prepared for trial, he would have used the police report from the arrest to impeach Baldwin and establish that the gun seized from him at his

---

[46]*Id.*, pp. 72, 80.

arrest was a black-finished Italian pistol.  Williams, however, has not established that Baldwin lied about the gun or that counsel's use of the gun as an exhibit was deficient.

The record reflects that counsel did in fact focus on the differences in the weapon recovered versus the one described by the witnesses in the four May robberies.  In fact, prior to the start of trial, the State conceded that the three female victims had already indicated that the weapon seized at Williams's arrest was <u>not</u> the weapon they saw during the robberies.[47]

In spite of this discrepancy, the State advised the Trial Court of its intent to present the black-finished Italian pistol at trial.  Defense did not oppose the request and instead strategically used the disparity in the weapons to raise reasonable doubt about his client's connection to the armed robberies.  For example, counsel elicited testimony from each of the victims that the gun used at the robbery a larger, silver pistol with a black handle, very different from the Italian pistol shown at trial.

Later at trial, Detective Baldwin testified that the gun he saw the date of Williams's arrest was a small, silver and black handgun.[48]  In spite of this, he nevertheless identified the black-colored Italian pistol to be the gun he saw that day.[49]  He further testified that, at the time, he believed the Italian pistol fit the description of the pistol used in the earlier robberies.

Defense counsel also showed the Italian pistol to Detective Baldwin and had him reconfirm that this was the gun he saw on the day of Williams's arrest.[50]  Counsel therefore used the detective's testimony about the gun to contrast it with the silver gun described by the victims.

---

[47]*Id*., pp. 5-6.

[48]*Id*., pp. 89, 93.

[49]*Id*., p. 93.

[50]*Id*., pp. 98, 102.

Williams first has not pointed to a lie or misinformation that was overlooked by counsel. Counsel clearly recognized and utilized Baldwin's testimony to show that the gun at trial, on which he relied, was not silver and was not the gun recognized by the victims. Counsel, therefore, was able to use the Italian pistol to elicit testimony from the witnesses, including Detective Baldwin, to clearly demonstrate that the gun from Williams's arrest was not the gun seen by these victims when they were robbed. The testimony before the jury was clear that Detective Baldwin based his investigation into Williams's role in the May 2008 robberies on a gun that in no way fit the description made by the victims and which each of the victims denied was the gun used against them.

For these reasons, there is no support for Williams's suggestion that his counsel did not grasp the importance of the distinguishable guns or that counsel failed to use the guns' descriptions to attempt to discredit or impeach Detective Baldwin. As such, Williams has failed to point to a deficient performance or unreasonable decision by his counsel or to an action that prejudicially impacted the outcome of trial.

For all of the foregoing reasons, the state courts' denial of relief on the issue of ineffective assistance of counsel was not contrary to, or an unreasonable application of, *Strickland*. Williams is not entitled to relief on any facet of his claim.

**VII.    State's use of Perjured Testimony (Claim No. 3)**

Williams claims that the State knowingly allowed Detective Baldwin to falsely testify about the description of the handgun retrieved at the time of his arrest on other robbery charges, and the testimony led to his identification and the guilty verdict. The State argues that the claim is without merit.

Williams raised this claim in his state application for post-conviction relief which was denied as meritless when the state trial court resolved that Williams failed to prove that the State was aware of any false testimony. This was the last reasoned opinion on the issue because the Louisiana Fourth Circuit and the Louisiana Supreme Court denied relief without further reasons. *Ylst*.

A claim of prosecutorial misconduct presents a mixed question of law and fact. *Brazley v. Cain*, 35 F. App'x 390, 2002 WL 760471, at *4 n.4 (5th Cir. Apr. 16, 2002) (citing *United States v. Emueqbunam*, 268 F.3d 377, 403-04 (6th Cir. 2001); *Jones v. Gibson*, 206 F.3d 946, 958 (10th Cir. 2000); *United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir. 1997); *United States v. Spillone*, 879 F.2d 514, 520 (9th Cir. 1989)). The Court therefore must determine whether the state courts' rulings were contrary to, or an unreasonable application of federal law.

A State denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 766 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). To obtain relief, the defendant must show that (1) the testimony was actually false, (2) the State knew it was false, and (3) the testimony was material. *Duncan v. Cockrell*, No. 02-20901, 2003 WL 21545926, at *3 (5th Cir. July 3, 2003); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). False evidence is "material" only if there is any reasonable likelihood that it could have affected the jury's verdict. *Duncan*, 2003 WL 21545926, at *3 (citing *Nobles*, 127 F.3d at 415).

As discussed in the prior section of this Report, Williams has not established that Detective Baldwin's testimony about the gun was actually false in any regard. The detective consistently testified that he believed the gun he saw at the time of Williams's arrest matched the description of the gun used against the four victims in May 2008. Baldwin also confirmed at trial that the gun

displayed by the State was the gun he saw, and that gun clearly was not silver with a black handle. Detective Baldwin's testimony was consistent both before and during trial and would not have given the prosecutor reason to consider it to be false.

In fact, it was the prosecutor who prior to trial informed the Trial Court and defense counsel that the female victims indicated that the gun seized at Williams' arrest was <u>not</u> the gun used to rob them. Thus, based on the record, it is inconceivable that Williams argues that the State attempted to hide the truth about the gun or that Detective Baldwin testified falsely. The State clearly placed the clarification on the record to disclose that three of the witnesses confirmed before trial that the Italian pistol was not the weapon from their robbery.

The jury also clearly heard Detective Baldwin's testimony about his belief that the guns were similar and that the gun was one basis for him to include Williams as a suspect in the May robberies. The jury also could see that the gun displayed at trial was black-colored and not the silver pistol repeatedly described by the victims.

Therefore, Williams has pointed to nothing false or hidden. The jury was perfectly capable of assessing the conflicting testimony or conflicting gun descriptions in evaluating the rest of the overwhelming evidence establishing Williams's guilt. Furthermore, a conflict in testimony does not render the testimony false or perjured. *See United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004), *cert. denied*, 544 U.S. 978 (2005) ("Wall has not established that McDowell's testimony was actually false. He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was 'actually false.'"). Matters like this of witness credibility frequently arise at trial and are for the jury to resolve, not for this court to second-guess on habeas review.

Williams has offered nothing to support his claim that Baldwin lied or that the State suborned false or perjured testimony. For these reasons, Williams has failed to establish that the state courts' denial of relief on this claim was contrary to or an unreasonable application of Supreme Court precedent. He is not entitled to relief on this claim.

## VIII.  Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Lawrence Williams's petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[51]

New Orleans, Louisiana, this 4th day of April, 2014.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[51]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.